IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 4:15-cv-00597BRW |
| v. | ) ) ) | |
| WINDSTREAM COMMUNICATIONS. | ) ) | |
| Defendant. | ) | |

**MEMORANDUM BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON WHETHER STEPHANIE
JOHNSON IS A QUALIFIED INDIVIDUAL WITH A DISABILITY**

Plaintiff Equal Opportunity Commission (Commission) respectfully submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment that Claimant Stephanie Johnson (Johnson) is a "qualified individual with a disability" as defined by the ADA. The Commission files a Statement of Material Facts as to which it contends there is no material disputes to be tried as required by Local Rule 56.1(a).[1]

**INTRODUCTION**

The Commission filed its Complaint on September 29, 2015, on behalf of Johnson to correct unlawful employment practices on the basis of disability in violation of Title I of the Americans with Disabilities Act of 1990 (ADA), as amended by the Americans with Disabilities Act Amendment Act of 2008 (ADAAA), and Title I of the Civil Rights Act of 1991. The Complaint alleges, among other things, that Windstream Communications (Windstream or

---

[1] All exhibits, including those only referenced in this memorandum, are attached to the Statement of Material Facts.

Defendant) failed to provide Johnson with a reasonable accommodation and constructively discharged her because of her disability.

I.    **Background**

Johnson has diabetes and has had this disease since the age of four. (Ex1, Johnson at p. 40). Johnson is insulin dependent and monitors her blood glucose levels approximately three times daily. (Ex 1, Johnson at p. 40).

Johnson began working for Defendant through a temporary agency as an Associate Network Analyst (ANA). Defendant hired Johnson as a permanent employee in this same position in May of 2013. (Ex 1, Johnson at p. 12). As an ANA, Johnson would troubleshoot network issues and work with the technicians in the field to help the technician resolve the issues for the customers. (Ex 1, Johnson at p. 18). Other job duties included working tickets for new orders and working orders to delete service, upgrade service, and downgrade service. (Ex 1, Johnson at pp. 22-23).[2]

Windstream maintains three shifts—first shift operates from 8:00 a.m. to 5:00 p.m., second shift operates from 3:00 p.m. to midnight, and third shift operates from midnight to 9:00 a.m. or midnight to 11:00 a.m. (Ex 2, Bland at p. 19). Approximately every quarter, most Windstream employees (this includes all ANAs)(Ex 1, Johnson at pp. 33-34; Ex 2, Bland at p. 28) bid on one of the three shifts (called a shift bid), and certain factors determine the bidding order. (Ex 3, David Staufer email).[3]

All ANA positions become available at the time of a shift bid. (Ex 2, Bland at p. 34; Ex

---

2 Johnson did not deal directly with customers, only technicians. (Ex 1, Johnson at p. 24).
3 Prior to September of 2012, Defendant's bidding system was based totally on seniority. In June of 2012 Defendant changed the criteria for its bidding system. (Ex 2, Bland at 22; Ex 3, Staufer email). Defendant's Little Rock facility is non-union; therefore, the facility is not subject to a collective bargaining agreement. (Ex 6, Camp at pp. 19-20).

6, Camp at 23). All ANAs begin their employment on first shift for training purposes; therefore, Johnson worked on first shift from her hire date in May of 2013 until her training was complete. (Ex 2, Bland at p. 25). Johnson experienced her first shift bid on November 17, 2013, at which time she moved to second shift. (Ex 2, Bland at pp. 37-38, 50-51). Working on first shift did not cause Johnson any problems with her diabetes control. (Ex 1, Johnson at p. 37).

For the quarterly shift bid, ANAs are ranked based on the following:

- Time with the company----30%
- Productivity (UPH)---------30%
- Quality (audit scores)-------30%
- Attendance--------------------10%

(Ex 3, David Staufer email).

Using the above criteria, ANAs with the highest ranking are entitled to bid first, with the lowest ranking ANAs bidding last. The ANAs bidding first generally bid on first shift positions. Because lower ranking ANAs bid last, they are generally left with the other two shifts. When Johnson became subject to her first shift bid on November 17, 2013 (Ex 2, Bland at pp. 50-51), due to her low quality scores and junior tenure, Johnson was among the last to bid. Johnson's shift options were second or third shift, and Johnson began working on second shift—3:00 p.m. to midnight. (Ex 1, Johnson at p. 36). Working on second shift did not cause Johnson any problems with her diabetes control. (Ex 1, Johnson at p. 37).

The next shift bid occurred on or about March 9, 2014. (Ex 2, Bland at pp. 51-52). Johnson still ranked low in the shift bid process, with her ranking again requiring her to bid among the last of the ANAs. For this shift bid, Johnson had the option to choose either second or third shift, and this time Johnson chose to work on shift three—midnight to 11:00 a.m.— because she believed that shift would give her more flexibility to spend time with friends and

family.  (Ex 1, Johnson at p. 58).  Johnson began working the third shift on or about March 9, 2014,[4] and shortly thereafter, Johnson began experiencing problems with her diabetes control. (Ex 1, Johnson at p. 37).  Johnson began experiencing erratic blood sugar levels.  (Ex 1, Johnson at pp. 37-38).

Johnson's supervisor during her entire employment was Edward Bland.  (Ex 1, Johnson at p. 20).  In early April of 2014, Johnson asked Bland to transfer to the first shift.  (Ex 1, Johnson at p. 60).  Johnson informed Bland that working on third shift affected her sleep which in turn affected her diabetes.  (Ex 1, Johnson at p. 60; Ex 2, Bland at pp. 39, 62).  Even though Johnson requested a move to first shift, because she had not experienced any problems with her diabetes on second shift, a transfer to second shift would also have accommodated her disability. (Ex 1, Johnson at p. 61).  Following her conversation with Bland about transferring off of third shift, on or about March 31, 2014, Johnson applied for a position in network security in an attempt to work in a position that was not subject to a shift bid in order to get her glucose levels under control.  (Ex 1, Johnson at pp. 62-64, 227-228; Ex 4, Johnson network security application document).

Johnson provided Bland with a letter from her doctor's office in May of 2014.  (Ex 1, Johnson at p. 62).  The letter informed Defendant that working the hours of the third shift affected Johnson's sleep, which in turn affected her blood sugar levels.  The letter also suggested a shift change as an accommodation.  (Ex 5, Letter requesting accommodation dated May 6, 2014).

Bland submitted Johnson's letter to Human Resources Business Partner Berenger Camp. Following her receipt of the letter, Camp emailed Johnson and attached an ADA Interactive

---

4 On third shift, Johnson worked four consecutive 10 hours shifts from Friday through Monday, and she was off on Tuesday through Thursday.

Process Questionnaire.  (Ex 1, Johnson at pp. 70-71; Ex 7, Uncompleted ADA questionnaire; Ex 9, Camp 5-18-14 email to Johnson).  Johnson's doctor's office completed the form and wrote that night shift work made Johnson's diabetes control more difficult because it disrupts the usual sleep patterns.  (Ex 8, Completed ADA questionnaire).  Johnson returned the form to Camp.

Following the receipt of Johnson's completed form, Camp sent Johnson an email denying Johnson's request to move to another shift.  (Ex 1, Johnson at pp. 74-75; Ex 9, Camp 5-21-14 email to Johnson).  Camp's email informed Johnson that Defendant did not have any day shifts available.  Camp's email did not mention any other options for Johnson with regard to an accommodation.  (Ex 9, Camp 5-21-14 email to Johnson).  Johnson's email response to Camp informed Camp that she (Johnson) intended to take the next step.  (Ex 9, Johnson 5-23-14 email to Camp).  Then, and only then, did Camp write another email and mention leave of absence as an option or mention other open positions.  (Ex 10, Camp 5-27-14 email to Johnson).   With regard to Camp's reference to an open position, Johnson informed Camp that she had looked at the board and the only openings were for shift work—which would still subject Johnson to a shift bid.  (Ex 10, Johnson's 5-30-14 email to Camp).  With regard to Camp's reference to a leave of absence, Camp gave no further explanation.  (Ex 6, Camp at pp. 37-38).

Windstream offers three types of leave for employees with medical issues.  Windstream offers leave under a Sick Pay Program (seven days), leave under its Short Term Disability Program (up to 26 weeks), and leave under the Family Medical Leave Act (FMLA).  (Ex 11, Handbook portions).  Significantly, leave under Windstream's first two options provide for paid leave.  (See exhibit 11).  Johnson was unaware of the types of leaves of absence or that any of the leave choices were with pay.  (Ex 1, Johnson at pp. 81, 228), and Camp never discussed with Johnson the types of leave that were available.  (Ex 6, Camp at pp.37-38).  In fact, other than to

issue discipline to Johnson, Camp never had any in-person meetings with Johnson, not even to "interact" to determine if there was a reasonable accommodation available to Johnson. (Ex 1, Johnson at pp. 84-85, 228-229; Ex 6, Camp at pp. 31, 33-34, 38).

On or about May 30, 2014, Johnson fell asleep at work due to her lack of sleep related to the sleep issues she was experiencing because of working third shift. On or about June 9, 2014, Defendant issued Johnson a final written warning for sleeping on the job. (Ex 12, June final warning). During the meeting to discuss the incident, Johnson attempted to point out the issues she was experiencing with her diabetes and her sleep. (Ex 6, Camp at pp. 49-50). Camp, however, refused to discuss Johnson's diabetes or sleep issues at this meeting. (Ex 6, Camp at pp. 49-50). On June 13, 2014, Johnson submitted her two week notice because Windstream was forcing her to choose between her health and her job. (Ex 13, Two week notice).

## II.     Summary Judgment Standard

Summary judgment should only be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. If the dispute about a fact is genuine – that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party – summary judgment is inappropriate. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The Commission meets this burden.

**III.     Argument—Stephanie Johnson Is Disabled As Defined By The ADA**

Title I of the ADA prevents employers from discriminating against a "qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a); *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 948 (8th Cir. 1999). With the passage of the ADAAA of 2008, Congress asserted its intention "to restore the intent and protections of the Americans with Disabilities Act of 1990." Pub. L. No. 110-325, preamble, 122 Stat. 3553 (2008). Congress explained that it had "expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973, [but] that expectation has not been fulfilled." *Id.* § 2(a)(3) (codified at 42 U.S.C. § 12101 note). Criticizing the Supreme Court for "eliminating protection for many individuals whom Congress intended to protect," *Id.* § 2(a)(4), Congress expressly repudiated the holdings of *Sutton* and *Toyota Motor Manufacturing*. *Id.* §§ 2(a)(4)-(7). Congress declared that a purpose of the ADAAA was to "reinstat[e] a broad scope of protection to be available under the ADA." *Id.* § 2(b)(1).

**A.  Diabetes Is a Physical Impairment**

To prevail on its claim, the Commission must show that Johnson is disabled within the meaning of the ADA. Under the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more of the major life activities of such individual, a record of such impairment, or being regarded as having such an impairment. 42 U.S.C. §12102(2).[5] Because diabetes is a metabolic disease in which the body's inability to produce any or enough

---

5 Johnson has a disability as defined by the first part of the definition.

insulin causes elevated levels of glucose in the blood, the disease meets the definition of physical impairment.  A physical impairment is defined as any physiological disorder, condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:

- Neurological
- Speech organs
- Musculosketetal
- Cardiovascular
- Hemic
- Special sense organs
- Lymphatic
- Respiratory
- Skin
- Endocrine

(Ex 14, ADA fact sheet).

Based on the above, Johnson meets the first prong of the definition.

### B.  Diabetes Affects Johnson's Major Life Activities

The second inquiry is whether or not diabetes substantially limits a major life activity. Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning, and working as well as sitting, standing, lifting, and reaching. *Taylor v. Nimock's Oil Co.*, 214 F.3d 957, 960 (8th Cir. 2000); *Gretillat v. Care Initiatives*, 481 F.3d 649 (8th Cir. 2007); *Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 948 (8th Cir. 1999).  Courts also consider sleeping as a major life activity. *Scheffler v. Dohman*, 785 F.3d 1260, 1261 (8th Cir. 2015).

With the passage of the ADAAA, the term "major life activities" was broadened to include the operation of a major bodily function, including, but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.  29 CFR § 1630.2(h)(2)(i)(2).  Because

8

diabetes is a disease that affects the body's ability to produce insulin, it affects the major life activity of Johnson's endocrine system.

In addition to the effect on Johnson's endocrine system, diabetes can affect several of Johnson's other major life activities.  During times of high or low blood sugar episodes, Johnson indicated her diabetes affected her ability to communicate, concentrate, sleep, speak, and work. (Ex 15, EEOC ADA questionnaire).

As stated above, due to working on the third shift, Johnson experienced sleep issues which in turn affected her ability to manage her diabetes.  For example, from April 6, 2014, to April 29, 2014, Johnson had to increase her insulin intake by 10 units, from 32 units per day to 42 units per day because of fluctuations in her blood sugar levels.  (Ex 1, Johnson at p. 72; Ex 16, Glucose levels).

The Commission does not dispute that Johnson knew at hire that her shift could change through the bidding process; however, what Johnson did not know was how working on third shift would impact her ability to control her diabetes.

Even though Johnson's diabetes limits several of her major life activities, the inquiry does not end here.  The impairment must "substantially" limit one or more of Johnson's major life activities.

### C.  Johnson's Major Life Activities Are Substantially Limited

When Congress amended the ADA, it specifically rejected the "significantly restricted" standard as too stringent, *see* 42 U.S.C. § 12101 note, § 2(a)(8), and the revised regulation provides that "[a]n impairment need not prevent, or significantly or severely restrict, the

9

individual from performing a major life activity in order to be considered substantially limiting."

29 C.F.R. § 1630.2(j)(1)(ii) (2011). The regulation provides:

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

29 C.F.R. § 1630.2(j)(1)(ii) (2011).

When the ADAAA expanded coverage to include impairments that affect bodily functions, it also included a provision that provides that 'an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.' 42 U.S.C. § 12102(4)(D). Johnson suffers from diabetes ever day of her life; therefore, her endocrine system is substantially limited every single day of her life. When Johnson experiences high and low glucose levels, she is substantially limited in several major life activities as discussed above. Based on the relaxed definition of substantially limited, there is no question that that Johnson is substantially limited in several major life activities.

### D. Johnson Is a Qualified Individual with a Disability

The final inquiry to determine if Johnson is protected by the ADA is a determination of whether or not Johnson was a "qualified individual" with a disability.

Under the ADA a qualified individual must (1) possess the requisite skill, education, experience, and training for her position, and (2) be able to perform the essential job functions, with or without reasonable accommodation. *Kallail v. Alliant Energy Corporate Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012). Even though Johnson's rankings placed her near the bottom

in choosing a shift, being low in rank for a shift bid does not necessarily indicate poor performance. Bland evaluated Johnson's performance and indicated Johnson performed her position at an acceptable level. (Ex 17, Performance evaluation). According to Bland, the report card used for a shift bid is entirely separate from the performance evaluation/appraisal. (Ex 2, Bland at pp. 59-60). Bland told Johnson she was doing fine in her position (Ex 1, Johnson at p. 53). Bland also stated that an employee could have a good evaluation and a lower report card. (Ex 2, Bland at p. 60). Because Johnson was requesting an ANA position on another shift, she would perform the same job she performed on shift three. If Johnson were qualified to work as an ANA on third shift, it logically follows she was qualified to work as an ANA on either first or second shifts. Therefore, Johnson was qualified under the ADA.

Because of her diabetes, Johnson needed to move to either first or second shift as an accommodation. There is no dispute that Windstream considered the letter from Johnson's doctor's office as a request for an accommodation. (Ex 6, Camp at p. 28). Reassignment to a vacant position is a possible accommodation under the ADA. *See* 42 U.S.C. § 12111(9)(B). Although a "qualified individual with a disability" must be someone who can perform the essential functions of a job, the terms of 42 U.S.C. § 12111(8) do not limit the "qualified individual" inquiry to the individual's existing job. Instead, the scope of the statute plainly includes a disabled individual who can perform a company job that said individual "**desires.**" *Id*. *Cravens v. Blue Cross & Blue Shield*, 214 F.3d 1011, 1017 (8th Cir. 2000)(Emphasis added). In the case at bar, Johnson was not even requesting a different job; she was simply requesting her same job on a different shift.

To determine the appropriate reasonable accommodation, an employer may need to

"initiate an informal interactive process with a disabled employee in need of an accommodation. *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 951 (8th Cir. 1999). Windstream never did this.

Camp testified that following Johnson's submission of her ADA questionnaire, she never met with Johnson to discuss Johnson's request for accommodation, and the emails were her only form of communication with Johnson. (Ex 6, Camp at p. 31, 34). Additionally, it was only after Johnson said she would take "the next step" that Camp decided to send Johnson a second email regarding Johnson's request for an accommodation. (Ex 9, Camp 5-23-14 email to Johnson). Significantly, after receiving Johnson's request for an accommodation on or about May 7, 2014, Camp took no action on the matter for approximately two weeks at which time she sent Johnson the ADA questionnaire (Ex 9, Camp 5-18-14 to Johnson), and it was not until May 19, 2014, that Camp asked Bland to check on job openings. (Ex 18, Camp 5-19-14 email to Bland).

In violation of the ADA, Windstream refuses to consider transfer to another position as a reasonable accommodation. To transfer to another position, Windstream requires the employee to apply for the position. (Ex 6, Camp at pp. 23, 38-39). While Windstream states there were no open positions, all ANA positions would becomee open at Windstream's shift bid on July 13, 2014. (Ex 2, Bland at p. 34; Ex 6, Camp at p. 23; Ex 19, July schedule showing shift bid). Additionally, it is unknown if there were any job openings between the date of Johnson's request and the next two weeks when Camp finally asked Bland to check on open positions.

Johnson's last day to work was June 28, 2014. (Ex 13, Two week notice). Since Windstream's next shift bid was scheduled for July 13, 2014, this was a mere 15 days away until all ANA positions on all three shifts would become open. (Ex 2, Bland at 34; Ex 6, Camp at p.

12

23).

While there is a factual dispute as to whether or not Defendant could have accommodated Johnson by moving her to another shift (or whether the move would cause Defendant an undue hardship), there is no dispute that Johnson's condition entitles her to the protection of the ADA. As such, this Court should grant the Commission's motion for partial summary judgment.

## IV. Conclusion

Based on the above, the Commission requests that the Court grant its Motion for Partial Summary Judgment on the issue of whether Johnson is a qualified individual with a disability under the ADA. The determination that Johnson is a qualified individual with a disability will eliminate the necessity of presenting evidence and testimony regarding Johnson's medical condition and streamline the trial for either the Court or the jury to determine other issues.

Respectfully submitted,

**P. DAVID LOPEZ**
General Counsel

**GWENDOLYN YOUNG REAMS**
Associate General Counsel

**FAYE A. WILLIAMS**
Regional Attorney
TN Bar No. 011730

**GERALD THORNTON**
Supervisory Trial Attorney
TN Bar No. 15898

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Memphis District Office
1407 Union Avenue, Suite 901
Memphis, Tennessee 38104
(901) 544-0075

*/s/*Pamela B. Dixon
**PAMELA B. DIXON**
Senior Trial Attorney

EQUAL EMPLOYMENT
 OPPORTUNITY COMMISSION
Little Rock Area Office
820 Louisiana St., Suite 200
Little Rock, Arkansas  72201
(501) 324-5065
pamela.dixon@eeoc.gov

## CERTIFICATE OF SERVICE

I hereby certify a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing systems to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

   Regina A. Young
   W. Stuart Jackson
   WRIGHT, LINDSEY & JENNINGS, LLP
   200 West Capitol Avenue, Suite 2300
   Little Rock, AR  72201


November 22, 2016                              */s/ Pamela B. Dixon*
**Date**                                                **PAMELA B. DIXON**