IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION                                    PLAINTIFF

4:15-CV-00597-BRW

WINDSTREAM COMMUNICATION                                                   DEFENDANT

**ORDER**

Pending are Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment. The parties have filed respective responses and replies.[1] Based on the findings of fact and conclusions of law below, Defendant's Motion for Summary Judgment (Doc. No. 16) is GRANTED. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 13) is DENIED.

**I.      BACKGROUND**[2]

The Equal Opportunity Commission brought this case on behalf of Stephanie Johnson (I will usually refer to Ms. Johnson as "Plaintiff). Plaintiff, who suffers from diabetes, worked as an Associate Network Analyst in Defendant's Broadband Technical Assistance Center Department -- a call center. During her employment, Plaintiff worked three different shifts: 8 a.m to 5 p.m. ("First Shift"), 3 p.m. to 12 a.m. ("Second Shift"), and 12 a.m. to 11 a.m ("Third Shift").[3] When Plaintiff started as a trainee, she worked First Shift. However, when she was hired full time, there was no guarantee that she would work First Shift. Assignments to each

---

[1]Doc. Nos. 20, 22, 25, 26.

[2]Unless otherwise noted, the facts in this section are from the parties' Statements of Material Facts Not in Dispute. *See* Doc. Nos. 18, 24.

[3]Defendant's Statement of Material Facts Not in Dispute says Third Shift was from 12 a.m. to 9 a.m., but the difference is not material.

1

shift were done through a quarterly shift-bid process which was based, partially, on seniority. The first time Plaintiff participated in the shift-bid process, she chose Second Shift, which she began working in November 2013. At the next shift-bid process, Plaintiff chose Third Shift, which she began working on March 9, 2014. When working First Shift and Second Shift, Plaintiff did not have issues managing her diabetes. However, in April 2014 she began to have "erratic" blood sugar measurements. That same month, Plaintiff informed, for the first time, Defendant that she had diabetes and that working Third Shift was negatively affecting her sleep, which was causing problems with her diabetes management.

Eventually Plaintiff provided her supervisor with a letter from her doctor. The letter, dated May 6, 2014, indicated that "[w]orking the night shift has made sleep more difficult for [Plaintiff] and the lack of sleep could certainly be causing some fluctuations in her blood glucoses."[4] The letter noted that Plaintiff "would benefit from working a day shift" so she would not have the sleep problems that caused diabetes-management issues.[5] Plaintiff's supervisor sent the letter to the Human Resources Department ("HR"). In response, HR provided Plaintiff with an "ADA interactive process questionnaire" and told her to fill out the form and indicate what accommodation she was requesting.[6] On May 18, 2014, Plaintiff returned the filled-out questionnaire to HR, and, as an accommodation, she asked to work "day shift."[7] The next morning, HR advised Plaintiff's supervisor of the request and asked if the accommodation could

---

[4] Doc. No. 23-2.

[5] *Id.*

[6] Doc. No. 16-4.

[7] Doc. Nos. 16-6, 16-7. This is the phrase Defendant used. The actual form is not part of the record.

be made without causing "a hardship to the business."[8]  A few hours later, the supervisor responded: "At this time, we need that position filled.  Volunteers were requested to trade shifts with [Plaintiff] but no one desired to trade.  There is no way to move her without causing a hardship to the business."[9]

On May 21, 2014, HR informed Plaintiff no "day shift" positions were available and the request accommodation was unavailable at that time.  Two days later, Plaintiff responded, "Fine. I'll just take the next step."[10]  In a second email, sent a minute later, Plaintiff wrote, "Not having any days shifts available is irrelevant to the fact that my current shift is affecting my health. Like I said, I will be taking the next step in this process."[11]  HR responded:

> I am not sure what you mean by next steps.  But, is there something else that we could do to help you be able to perform the essential functions of your job?  For example, are there any other open positions that you would be interested in?  Or you could also pursue Leave of Absence options.[12]

On May 30, 2014, Plaintiff responded that she had looked at other job postings and that only one position was available, and she was not interested in it.  She also complained about someone else getting a position that she had previously applied for.  That same day, Plaintiff fell asleep on the job from 1 a.m. to 6 a.m.  Plaintiff admitted that she fell asleep because she was tired and did not have sufficient work to keep her busy.  On June 8, 2014, she was written up for the infraction, but refused to sign the Corrective Action Report.[13]

---

[8]Doc. No. 16-7.

[9]*Id.*

[10]Doc. No. 16-6.

[11]Doc. No. 16-8.

[12]*Id.*

[13]Doc. No. 16-9.

3

On June 13, 2014, Plaintiff gave Defendant her two-weeks' notice and indicated that her last day on the job would be June 28, 2014. The next day, she asked to move her resignation date to July 5, 2014, but the request was denied based on company policy.[14]

Plaintiff filed this complaint on September 24, 2015 alleging that Defendant failed to provide a reasonable accommodation, and that she was constructively discharged.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[15] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[16]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should only be granted when the movant has established a right to the judgment beyond controversy.[17] Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.[18] This court must view the facts in the light most favorable to the party opposing the motion.[19] The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

---

[14]Doc. No. 16-11.

[15]*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed R. Civ. P. 56.

[16]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[17]*Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[18]*Id.* at 728.

[19]*Id.* at 727-28.

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.[20]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[21]

## III. DISCUSSION

Plaintiff asserts that Defendant did not engage in the interactive process or offer her a reasonable accommodation. She also contends that she was constructively discharged.

### A. Interactive Process

An employer and employee are required to participate in the interactive process[22] once the employee advises the employer that she has a disability and needs an accommodation to perform the essential functions of her job.[23] Plaintiff asserts that Defendant failed to engage in good faith in the interactive process, but this is unsupported by the facts. Instead, the facts suggests that it was Plaintiff who failed to engage in good faith in the interactive process.

---

[20]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[21]*Anderson*, 477 U.S. at 248.

[22]I use this somewhat distasteful phrase because it is in the statute.

[23]*Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899, 906 (8th Cir. 2015).

Plaintiff argues that Defendant failed to engage in the interactive process because Defendant failed to explain the types of leave available to her.[24] This argument fails for three reasons: (1) Plaintiff did not ask for details, which would have been a proper response to the email; (2) Plaintiff had the details in her employee handbook, which she admits she never consulted; and (3) Plaintiff flat-out rejected the idea of leave, advising that if she left, she wouldn't return. When asked why she would not return, Plaintiff testified that it was because she was "not given the accommodation that [she] asked for . . . ."[25]

Plaintiff also contends that delays in the interactive process show that Defendant was not acting in good faith. However, the delays in interaction are attributed to the fact that Plaintiff works Third Shift, Thursday through Sunday, and HR works First Shift, Monday through Friday. In fact, Plaintiff even recognized that there is limited overlap between the hours she works and HR works. She testified to that she did not respond to a Wednesday email from HR until Friday, because that's when she returned to work.[26]

Plaintiff informed Defendant that working Third Shift was causing problems with managing her diabetes. Though it is unclear when Plaintiff first made this known,[27] the difference of a week or two is not substantial. Plaintiff's supervisor testified that when he was

---

[24]Doc. No. 23.

[25]Doc. No. 16-1.

[26]*Id.*

[27]Plaintiff testified that she "may" have asked her supervisor about changing shifts "in April 2014" and that it was "approximately" in April. (Doc. No. 23-1). In her brief, she claims it was "on or about April 9, 2016" based on testimony that she started noticing problems "about a month into the third shift." (Doc. No. 23) Her supervisor testified that he was advised about her issues "approximately a week or so before [he] saw [the May 6, 2014] doctor's note" and "[p]robably within a week of that note being produced." (Doc. No. 15-2).

6

first notified, he would have given Plaintiff the contact information for HR[28] -- Plaintiff has not refuted this testimony.  Plaintiff's supervisor also testified that he asked other employees if they would volunteer to switch with Plaintiff, and encouraged Plaintiff to do the same.[29]

But these are the undisputed facts: Some time after May 6, 2014, Plaintiff provided her supervisor with a letter from her doctor regarding her diabetes, and he gave it to HR.  HR provided Plaintiff with an ADA Interactive Process Questionnaire.[30]  Plaintiff returned the questionnaire at 1:25 a.m., Sunday, May 18, 2014, and, the next morning, HR asked a supervisor about the accommodation.[31]  Over the next two weeks, Plaintiff and HR discussed possible options.  Defendant informed Plaintiff there were no "day shift" openings available, but, if one opened up, they could discuss it. So, Plaintiff threatened to go to the EEOC.  Based on the record, there were no openings on "day shift," no one volunteered to switch with Plaintiff, and the Third Shift position needed to be filled.[32]

Defendant asked Plaintiff if she was interested in any other open positions.  Plaintiff responded "I have looked on the board and the only option I have is DNOC and 1) I don't want to work in DNOC and 2) it's also shift work and could very possibly have me working the same shift I have now."[33]  However, Plaintiff later testified that she never looked at the job board to

---

[28]Doc. Nos. 23-3.

[29]Doc. No. 16-2.

[30]Plaintiff contends that HR sent this email on May 18, 2014 (Doc. No. 15).  However, that email is Plaintiff's response to HR.  So, HR must have provided Plaintiff with the information before May 18.  HR testified that it typically gives employees two weeks to get the form returned.  (Doc. No. 16-4).  Plaintiff provided no evidence to contradict this statement.

[31]Doc. Nos. 16-6, 16-7.

[32]Doc. No. 16-7.

[33]Doc. No. 16-8.

7

see if there were other positions.[34]  When Defendant asked whether Plaintiff was interested in "pursu[ing] Leave of Absence options," Plaintiff said that if she "did a leave of absence, [she] wouldn't be back."[35]

"[W]hen an employer initiates an interactive dialogue in good faith with an employee for the purpose of discussing potential reasonable accommodations for the employee's disability, the employee must engage in a good-faith effort to work out potential solutions with the employer prior to seeking judicial redress."[36]  Plaintiff rejected both the idea of another job opening and a leave of absence.  Instead of continuing to engage in the interactive process, Plaintiff threatened to go to the EEOC and gave her two-weeks' notice a few weeks later.

### B. Reasonable Accommodation and Constructive Discharge

A claim for failure to make a reasonable accommodation is reviewed a modified burden-shifting analysis.[37]  Plaintiff must "first make a facial showing that [she] has an ADA disability and that [she] has suffered adverse employment action."[38]  Assuming without deciding that Plaintiff has an ADA disability, she cannot establish that she suffered an adverse employment action, because she resigned.[39]

In response to the fact that resignation means there was no adverse employment action, Plaintiff asserts that she was constructively discharged.  She contends that she was forced to

---

[34]Doc. No. 20-2.

[35]Doc. No. 16-8.

[36]*E.E.O.C. v. Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 133-34 (1st Cir. 2014).

[37]*Fenney v. Dakota, Minnesota & Eastern R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).

[38]*Id.*

[39]*Id.* at 717.

8

resign because Defendant, by failing to make a reasonable accommodation, was making her chose between her health and her job.[40]

To establish a constructive discharge, Plaintiff must show that she subjectively believed the environment was abusive, that a reasonable person would have "found the conditions of employment intolerable" and that Defendant "either intended to force [Plaintiff] to resign or could have reasonably foreseen that [she] would do so as a result of its actions."[41] The undisputed facts do not support a claim for constructive discharge.

Before Plaintiff resigned, Defendant was attempting to find a reasonable accommodation for Plaintiff. After learning of Plaintiff's request to move to First Shift or Second Shift because of her disability, HR inquired with management regarding whether it was possible to move Plaintiff to "day shift". When HR informed Plaintiff that there were no openings at that time, Plaintiff said she was going to pursue a claim before the EEOC. Defendant asked Plaintiff if she was interested in any other open positions. Plaintiff responded that she was not interested in the position that was available. Plaintiff also rejected a possible leave of absence, stating that if she "did a leave of absence, [she] wouldn't be back."[42] This was only 12 days after Plaintiff returned the ADA Interactive Process Questionnaire.

Plaintiff's working conditions were not so intolerable that they forced Plaintiff to quit. Again, Defendant was actively engaged in the interactive process to find Plaintiff a reasonable accommodation. Rather than engage in the process, Plaintiff threatened to "take the next step." Finally, she quit when she was not satisfied with the accommodations that Defendant offered

---

[40]Doc. No. 23.

[41]*Fenney,* 327 F.3d at 717.

[42]Doc. No. 16-8.

her. Additionally after Plaintiff gave her two-weeks' notice, she attempted to move her last day back by another week. This request contradicts Plaintiff's constructive discharge claim, since clearly the conditions were not so intolerable that they would prevent her from working one more week.

### C. Reassignment

Plaintiff notes that "[r]eassignment to a vacant position is a possible accommodation under the ADA."[43] "While reassignment to a vacant position can be a reasonable accommodation under the ADA, it is not necessarily required."[44] But, more importantly, the undisputed facts are that there was no vacant positions on First Shift or Second Shift for which Plaintiff was qualified.

"An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation."[45] Since the accommodation Plaintiff requested was not available, Defendant suggested the possibility of another position or leave of absence as accommodations.

With regard to the other jobs, Plaintiff told Defendant that she was not interested in the one that was available. Additionally, she pointed out that the position was subject to shift-bids -- which assumes that Plaintiff would have ended up on Third Shift again -- and that Defendant would have required Plaintiff to apply for the job, rather than simply transfer. Even assuming that these arguments make Defendant's suggestions of other positions an empty offer,[46] Plaintiff

---

[43]Doc. No. 14.

[44]*Burchett v. Target Corp*, 340 F.3d 510, 517 (8th Cir. 2003).

[45]*Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).

[46]Plaintiff argues that Defendant "did not consider transfer to a different job position as an accommodation." (Doc. No. 23). Notably, Defendant was not obligated to offer a transfer to another job. Furthermore, Plaintiff identified no vacant positions which she was qualified to

cannot overcome the fact that a short leave of absence would have been a reasonable accommodation under the circumstances.  Although Plaintiff was not required to accept the offered accommodation, when she "reject[ed] a reasonable accommodation . . . that [was] necessary to enable [her] to perform the essential functions of the position . . . [she] will not be considered a qualified individual with a disability."[47]

Furthermore, Plaintiff is unable to show that the leave of absence option was not reasonable.  Plaintiff's only complaint about a leave of absence was that Defendant did not explain in enough detail what that entailed.  This does not defeat the fact that leave was a reasonable option and Plaintiff had an obligation inquire, under the interactive process, rather than resign.  Additionally, Plaintiff resigned 15 days before the shift-bid process was to take happen in July, and Plaintiff notes that "15 days is a 'short period of time.'"[48]  In fact, if Plaintiff would have been granted her requested extension of time to resign, it would have been only 8 days.  So, even assuming that the leave was without pay, Plaintiff would have been on leave for only a "short period of time" before being able to bid on a job on First Shift or Second Shift. Accordingly, under these facts, the leave option -- that Plaintiff rejected -- was a reasonable accommodation.

**D     Mr. Fisher's Hours**

Plaintiff asserts that she "simply wanted the hours that became available when Jake Fisher, an Associate Network Analyst 2 (ANA2), left his position" on First Shift.[49]  This

---

work.

[47]29 C.F.R. § 1630.9(d).

[48]Doc. No. 23.

[49]*Id.*

11

argument ignores the fact that she was not qualified for the position vacated by Mr. Fisher.[50] Plaintiff's argument that those "hours" should have been given to her is without merit. Those "hours," based on the record, were for a ANA2 who was involved in a special project that Plaintiff was not qualified to perform.[51] Though worded differently, Plaintiff essentially wanted Defendant to create a job for her on First Shift -- something they are not required to do under the ADA. "The ADA does not require an employer to create a new position or to eliminate or reallocate essential job functions in accommodating an employee with a disability."[52] Defendant needed a certain number of workers on each shift working Plaintiff's position. The fact that Mr. Fisher's position was open on First Shift is irrelevant, since Plaintiff did not qualify for the position.

## CONCLUSION

Based on the findings of facts and conclusions of law above, Defendant's Motion for Summary Judgment (Doc. No. 16) is GRANTED and Plaintiff's Motion for Partial Summary Judgment (Doc. No. 13) is DENIED.

IT IS SO ORDERED this 20th day of December, 2016.

/s/ Billy Roy Wilson
UNITED STATES DISTRICT JUDGE

---

[50]Plaintiff admitted this fact in her deposition. *See* Doc. No. 15-1.

[51]*Id.*

[52]*Otto v. City of Victoria*, 685 F.3d 755, 759 (8th Cir. 2012).